IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| OPENGATE CAPITAL GROUP LLC, et al., | : :  : | |
| Plaintiffs, | : : | |
| v. | :  : | C. A. No.: 13-1475-GMS |
| THERMO FISHER SCIENTIFIC INC., et al., | : : : | |
| Defendants. | : | |

## MEMORANDUM

## I. INTRODUCTION

On October 5, 2012, plaintiffs OpenGate Capital Group LLC and its subsidiaries ("OpenGate") contracted with defendant Thermo Fisher Scientific Inc. ("Thermo") to purchase a lab workstation business (the "Business") owned by Thermo's three subsidiaries ("Hamilton Entities"). (D.I. 14 at 19; D.I. 19, Ex. 1 at 17.) On May 10, 2013, six and a half months after the sale, OpenGate filed a suit against Thermo in the United States District Court for the Central District of California.

On July 5, 2013, Thermo moved to dismiss the first amended complaint for failure to state the claim under Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) ("FED. R. CIV. P."), as well as 15 U.S.C. § 78u-4. (D.I. 17.) In the alternative, Thermo moved to dismiss or transfer the case to the United States District Court for the District of Delaware. (D.I. 18.) On August 23, 2013, the California court granted Thermo's motion to transfer and stayed its motion to dismiss. (D.I. 30 at 5.)

For the reasons set forth below, the court will deny Thermo's motion to dismiss Claims III, IV, VI, and VII, and partially deny Thermo's motion to dismiss Claim I of OpenGate's first amended complaint.

## II. BACKGROUND

### A. The Parties

OpenGate Capital Group LLC is a Delaware limited liability company with its principal place of business in California. (D.I. 14 at 5.) Of its five subsidiaries named as plaintiffs in this action, one is organized under California law, while the other four are Delaware LLCs. (*Id.* at 5-6.)

Thermo is a publicly-traded Delaware corporation with its principal place of business in Massachusetts. (*Id.* at 6.) Thermo's annual revenues allegedly exceed $12 billion. (*Id.* at 2.) Other defendants named are Does 1 through 50. (*Id.* at 1.)

At the heart of this matter is the sale of Thermo's lab workstation Business to OpenGate. Thermo controlled the Business through Hamilton Entities, which are organized under Delaware law. (D.I. 19, Ex. 1 at § 1(i).) The Business manufactured laboratory furniture at two American facilities and one facility in Reynosa, Mexico (the "Reynosa facility"). (D.I. 14 at 2.) The Reynosa facility employed a workforce of approximately 1,000 and generated about 40-50% of the Business' revenue. (*Id.*) The Reynosa facility is located in an area "plagued by drug cartel violence." (D.I. 17 at 1.)

The sale of the Business to OpenGate proceeded in three stages. On June 28, 2012, Thermo announced its intent to sell the Business. (D.I. 14 at 2.) On July 2,

2

2012, OpenGate expressed interest in acquiring the Business. (*Id.* at 8.) The parties

signed a confidentiality agreement ("the Confidentiality Agreement") and began

negotiations. (*Id.* at 12, 14.)

On October 5, 2012, the parties signed a contract for the sale of the Business to

OpenGate ("the Contract") in exchange for $3 million in cash, 10% of OpenGate's fully

diluted equity at the time of the closing, and a $10 million promissory note. (*Id.* at 20;

D.I. 19, Ex. 1 at 9-10.)

### B.    Pertinent Contract Terms

The Contract contained a forum selection/choice of law clause, a merger clause,

and representations and warranties of both parties.

Pursuant to the forum selection/ choice of law clause,

> [the Contract] shall be governed by and construed in accordance with the
> internal laws of the State of Delaware without giving effect to any choice or
> conflict of law provision or rule (whether of the State of Delaware or any
> other jurisdiction) that would cause the application of laws of any jurisdiction
> other than those of the State of Delaware.

(D.I. 19, Ex. 1 at § 10.9.)

In the merger clause, the parties agreed the "[Contract] (including the documents

referred to herein) and the Confidentiality Agreement constitute the entire agreement

between [the parties]. This agreement supersedes any prior agreements and

representations by or between [the parties], whether written or oral, with respect to the

subject matter hereof (other than the Confidentiality Agreement.)" (*Id.* at § 10.4.) The

Confidentiality Agreement, incorporated into the Contract by reference, disclaimed

accuracy and completeness of any express or implied representation or warranty

3

Thermo and Hamilton Entities may have made to OpenGate during the negotiations and conduct of due diligence. (*Id*. at § 10.4.)

The Contract included twenty-five representations and warranties by Thermo. (*Id*. at §§ 2.1-2.25.) Among other things, Thermo represented that "since the Balance Sheet Date, there had not been any adverse changes in the financial conditions or results of operations of the Business, except for any adverse changes that would not reasonably be expected to result in a Business Material Adverse Effect." (*Id*. at § 2.7.) The Contract defined a "Business Material Adverse Effect" as "any change, effect, or circumstance that . . . is materially adverse to the business, financial condition or results of operations of the business taken as a whole . . . ." (*Id*. at § 2.1.)

Thermo also represented "all of the [Business'] properties and buildings, fixtures and improvements thereon . . . are in good operating condition . . . and all mechanical and other systems located thereon are in good operating condition . . . and no condition exists requiring material repairs, alterations or corrections . . . ." (*Id*. at § 2.11.) All buildings, fixtures, and improvements were "suitable, sufficient and appropriate in all material respects for their current and contemplated uses." (*Id*.) The title to the Business properties was purportedly in order, and the Business did not have undisclosed liabilities. (*Id*. at §§ 2.10, 2.11.)

In its representations and warranties, OpenGate agreed not to rely on Thermo's forward-looking statements, business projections (*id*. at § 3.10), and representations and warranties not incorporated into the Contract (*id*. at § 3.11).

4

## C. OpenGate's Contentions

OpenGate alleges Thermo decided to sell the Business in 2012. The primary reason behind Thermo's decision was the Gulf drug cartel activities at and around the Reynosa facility. The drug cartel activities were becoming increasingly disruptive to the point that they threatened the physical safety of the employees and jeopardized the Business. (D.I. 14 at 32.) OpenGate insists the cartel activities also threatened the title to the Reynosa facility and describes them as "encroachments," illegal easements, or an illegal right-of-way. (*Id.* at 12,17, 30.)

The cartel encroachments purportedly started at the latest on October 9, 2011. On that day, members of the Gulf drug cartel brandished weapons to gain access to the Reynosa facility's parking lot and left a vehicle there for approximately nine hours. (*Id.* at 21.) In the following months, the cartel members regularly left vehicles and tractor-trailers with unknown cargo in the parking lot overnight. (*Id.* at 22.) As of November 11, 2011, at least ten executives of Thermo and Hamilton Entities[1] knew about the increasing drug cartel activities at the Reynosa facility, either through communications with Roberto Enriquez ("Enriquez")[2] or from another source. (*Id.* at 2.)

In early 2012, Thermo hired a security company, PROSOL, to stop the cartel from entering the Reynosa facility parking lot. (*Id.* at 22, 26.) PROSOL suggested shielding the existing guard booths, modifying windows and doors, and installing remote

---

[1] OpenGate claims the following executives were clearly aware of the cartel activities in Reynosa: Ricardo Salazar ("Salazar"), Art Wood ("Wood"), John Mitchell, Thomas W. Loewald, Joseph S. Webb ("Webb"), Bob Simpson, Fiona Walker, Joseph A. Baiunco, Jared Slagle, and Amy L. Martin. (*Id.* at 24-25.)

[2] As of November 2011, Enriquez was the Country Human Resources Director for Mexico. (*Id.* at 24.)

5

guard booths, perimeter fencing, and parking lot access ramps. (*Id.*) The estimated cost for these security measures amounted to $218,425. (*Id.* at 26.) OpenGate argues that Thermo's plans to upgrade the security system at the Reynosa facility involved "capital expenditures," which should have been disclosed to OpenGate. (*Id.* at 26, 32.)

On June 28, 2012, Thermo announced its decision to sell the Business in a Form 8-K filed with the Securities and Exchange Commission ("SEC"). (*Id.* at 7.) Thermo allegedly concealed the cartel activity from potential buyers. (*Id.* at 2.) OpenGate claims it had no independent knowledge of the cartel activities and relied on Thermo's reports and representations in its decision to purchase the Business. (*Id.* at 9-11.)

Thermo purportedly insisted on a rushed sale with minimal due diligence and orchestrated the due diligence process to prevent discovery of problems with the cartel activities. (*Id.* at 3, 13.) Thermo also furnished inconsistent reports of its past financial performance, overly optimistic financial projections, and plans to consolidate production at Reynosa. (*Id.* at 11-12.)

Disclosures about the Reynosa facility ranged from the facility's geographic location to the level of employee satisfaction. (*Id.* at 3, 12.) Although Thermo advised of certain problems, such as the bankruptcy of a key supplier, its numerous projections, disclosures, and representations did not indicate the cartel presence or reflect expenditures on necessary improvements of the security system. (*Id.*)

In addition, OpenGate contends that Thermo restricted OpenGate's access to the Reynosa facility. According to OpenGate, "[a]t the same time it was drafting and negotiating . . . [the Contract with OpenGate, Thermo] was giving direct orders to

employees not to disclose information related to the situation at the plants.  On information and belief . . . Webb . . . Vice President of Manufacturing Operations, Sourcing [a]nd Logistics, told numerous employees not to answer questions if asked about the security situation and encroachments at the facilities." (*Id*. at 18.)

Some of the reports and disclosures OpenGate relied on in its decision to purchase the Business came from Thermo's leadership team. (*Id*. at 9.)  The team comprised Hamilton Entities' executives[3] with expertise in specific areas of the Business. (*Id*.)  Certain representations made by the leadership team later became part of the Contract. (*Id*. at 31.)  Other representations came from unidentified Thermo's representatives.  For example, when OpenGate inquired "about criminal activity on adjacent land, Thermo . . . responded . . . it was not a worry." (*Id*. at 12.)

Drug cartel encroachments continued after the parties began negotiations for the sale of the Business.  On September 23, 2012, in the midst of due diligence and more than two weeks before the closing, a Gulf cartel vehicle was chased by Mexican soldiers, or another cartel, and entered the Reynosa facility by the employees' parking lot. (*Id*. at 18.)  Members of the Gulf cartel then entered the facility and remained there for about an hour. (*Id*.)  Enriquez later reported this incident to Wood and John Mitchell, Thermo's Director of Corporate Security ("Mitchell").  Enriquez also inquired

---

[3]Those representatives of Thermo's leadership team included Salazar, Keith Davis ("Davis"), Tim Cloutier, and David Lamprey. (*Id*. at 9.)  According to OpenGate, Thermo designated Davis and Salazar "as having the requisite knowledge to provide the foundation for twenty-five separate representations and warranties on [Thermo's] behalf concerning the business, including the uses and conditions of the premises." (*Id*. at 31.)  Davis and Salazar also knew about the cartel encroachments at the Reynosa facility. (*Id*.)

whether Thermo would disclose the incident to OpenGate. (*Id.* at 22-23.) In response, Wood allegedly stated that due diligence was completed and it was not "the time to raise the issue." (*Id.* at 19.) In the same e-mail, Mitchell acknowledged "security measures . . . must be taken." (*Id.*)

Following the sale, Thermo secreted the evidence of its misconduct. (*Id.* at 4.) Approximately three weeks after the closing, a Thermo's representative, Darla Phillips ("Phillips"), "extracted an unknown number of original files from the Hamilton Entities' records . . . [in] a direct violation of paragraph 9.1(a) of the [Contract], which provides Thermo . . . only with the right to copy documents, with prior notice." (*Id.* at 27.) Thermo also removed the hard drive from Davis' computer and did not return either the hard drive or the files removed by Phillips. (*Id.* at 21, 27.)

On October 23, 2012, within hours of assuming possession and ownership of the Reynosa facility, OpenGate's representatives first learned about the cartel from a Reynosa facility employee who asked them to address the problem with the cartel. (*Id.* at 20.) In the following months, the presence of the cartel at the Reynosa facility remained "widespread and pervasive" to the point members of the cartel monitored the facility "24 hours a day, 7 days a week, even taking comfort in the air conditioned security booth . . . ." (*Id.* at 23.)

Following the sale, OpenGate also learned Thermo had failed to pay certain Mexican taxes. (*Id.* at 28.) The non-payment was contrary to the Contract terms and allegedly resulted in $2.6 million penalties. (*Id.*)

8

### D.     Procedural Background

On May 10, 2013, six and a half months after purchasing the Business, OpenGate filed a complaint against Thermo in the United States District Court for the Central District of California seeking special damages, punitive damages, and costs. (D.I. 1 at 26-27.)  On June 21, 2013, OpenGate filed the first amended complaint alleging (1) violation of Section 10(b) of the 1934 Securities Exchange Act (15 U.S.C. § 78j(b)) ("SEA") and Rule 10b-5 (17 C.F.R. § 240.10b-5); (2) fraudulent misrepresentation; (3) concealment; (4) negligent misrepresentation; (5) violation of Section 25400, *et seq.* of the California Corporations Code (the "CAL. CORPS. CODE"); (6) violation of Section 9(a)(4) of the SEA (15 U.S.C. § 78i(a)(4)); and (7) breach of the implied covenant of good faith and fair dealing.  (D.I. 14 at 28-47.)

On July 5, 2013, Thermo moved to dismiss the first amended complaint for failure to state a claim under FED. R. CIV. P. 8(a), 9(b), and 12(b)(6), as well as 15 U.S.C. § 78u-4.  (D.I. 17.)  In the alternative, Thermo moved to dismiss or transfer the case to the United States District Court for the District of Delaware.  (D.I. 18.)

On August 23, 2013, the California court granted Thermo's motion to transfer pursuant to 28 U.S.C. § 1406 and stayed its motion to dismiss.  (D.I. 30 at 5.)  In its decision to transfer, that court chiefly relied on the parties' contractual choice to adjudicate disputes under Delaware law.  (*Id.* at 4.)  On August 26, 2013, the case was transferred to the United States District Court for the District of Delaware.  (*Id.* at 5.)  This decision addresses Thermo's motion to dismiss for failure to state a claim.

9

## III. LEGAL STANDARDS

### A. Rule 12(b)(6) of FED. R. CIV. P.

In analyzing a motion to dismiss under Rule 12(b)(6) of FED. R. CIV. P., a review of Rule 8(a)(2) of FED. R. CIV. P. is necessary. Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also* FED. R. CIV. P. 12(b)(6). The plausibility standard does not rise to a "probability requirement" but requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Courts, however, are not required to credit "labels," "conclusions," and "formulaic recitation[s] of the elements of a cause of action" as true. *Twombly*, 550 U.S. at 555.

The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See id*. at 555-57. Evaluating a motion to dismiss under Rule 12(b)(6) requires the court to accept as true all material allegations of the complaint. *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat*

10

*Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997). A motion to dismiss may be granted only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to [the] plaintiff, [the] plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (quoting *In re Burlington,* 114 F.3d at 1420).

## B. Rule 9(b) of FED. R. CIV. P.

Rule 9(b) imposes a heightened pleading standard of factual particularity "[i]n all averments of fraud or mistake." FED. R. CIV. P. 9(b). A plaintiff alleging fraud must aver with sufficient particularity to place the defendant on notice of the "precise misconduct" with which he is charged. *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). Factual particularity does not require that the plaintiffs plead every material detail of the fraud, such as date, location, and time as long as they find "alternative means of injecting precision and some measure of substantiation into their allegations . . . ." *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 577 (D.N.J. 2001).

Courts may relax the heightened pleading standard under Rule 9(b) where a plaintiff can show "the requisite factual information is peculiarly within the defendant's knowledge or control . . . ." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). Even where "sophisticated defrauders" may successfully conceal the details of their frauds, boilerplate and conclusory allegations will not suffice. *Id.*

## C. Section 78u-4(b) of the Private Securities Litigation Reform Act ("PSLRA")

The heightened pleading requirement of Section 78u-4(b) of the PSLRA imposes an additional layer of factual particularity superseding the standard of Rule 9(b). *In re*

11

Rockefeller, 311 F.3d at 215-18. Section 78u–4(b)(1) requires the plaintiff pleading securities fraud to specify (1) each statement alleged to have been misleading; (2) the reason why the statement is misleading; and (3) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u–4(b)(1). Pursuant to Section 78u–4(b)(2), a plaintiff must "state with particularity facts giving rise to a strong inference" of the defendant's scienter. 15 U.S.C. § 78u–4(b)(2). Allegations of securities fraud must therefore resemble "the first paragraph of any newspaper story" and set out the "who, what, when, where and how" of the events at issue. In re Burlington, 114 F.3d at 1422.

## IV. DISCUSSION

### A. Violations of the Federal Securities Law

OpenGate pleads two federal securities law violations. Claim I in its first amended complaint alleges Thermo's violation of Section 10(b) of the SEA (15 U.S.C. § 78j(b)) and Rule 10b–5 promulgated under it (17 C.F.R. § 240.10b–5). OpenGate's Claim VI alleges Thermo's violation of Section 9(a)(4) of the SEA.

#### 1. Section 10(b) of the SEA and Rule 10b-5

Thermo moves to dismiss Claim I for failure to allege a material representation or omission, scienter, and reliance. (D.I. 17 at 7-19.) Thermo separately argues OpenGate fails to allege "scheme" liability under Section 10b-5(a) and (c). (Id. at 19-21.)

Section 10(b) of the SEA makes it

12

> unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Pursuant to Section 10(b), the Commission promulgated Rule 10b–5, which creates a private cause of action for plaintiffs harmed by defendants' fraud. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006). Liability under Section (b) of Rule 10b-5 is premised on the defendant's untrue statements and statements omitting material acts. 17 C.F.R. § 240.10b-5(b). In a typical Section 10(b) *private* action based on Rule 10b-5(b), a plaintiff must allege (1) a material misrepresentation or omission by the defendant; (2) the defendant's scienter; (3) a connection between the misrepresentation or omission and the purchase, sale, or swap of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

A misrepresentation or omission is material when the resulting statement is misleading as to a material fact. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). A fact is material if there is "a substantial likelihood . . . the disclosure of the . . . fact would have been viewed by the reasonable [securities buyer or seller] as having significantly altered the total mix of information made available." *Id. See also In re Burlington*, 114 F.3d at 1425 ("material" facts are facts a reasonable investor would find important in making an investment decision).

Scienter is a mental state embracing intent to deceive, manipulate, or defraud. *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 674 (3d Cir. 2011). To plead scienter in the securities fraud context, plaintiffs must allege facts giving rise to a "strong inference" of reckless or conscious behavior. *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009). Recklessness means an extreme departure from the standards of ordinary care presenting a danger of misleading buyers or sellers, when the defendant either knows about this danger or the danger is so obvious the defendant should have been aware of it. *Horizon Lines*, 442 F. App'x at 674-75. The pertinent question is whether all facts alleged, taken collectively, give rise to a strong inference of scienter, and not whether any individual allegation, scrutinized in isolation, indicates scienter. *Avaya*, 564 F.3d at 267-68.

The most direct way "a plaintiff can plead reliance is by alleging . . . he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2185 (2011). To ascertain reliance, courts typically look at the facts surrounding the plaintiff's decision to engage in the transaction. *Id.* at 2186. A sophisticated purchaser may reasonably rely on the honesty of those with whom he deals in the absence of knowledge that his trust is misplaced. *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 883 (3d Cir. 2000).

Under Delaware law,[4] an individual may bind a corporation when the corporation identifies the individual as its agent to a third party and the third party reasonably relies

---

[4]For the discussion of the law governing state claims, see *infra* Part IV.B.1.

on the representation. *See Vichi v. Koninklijke Philips Elec., N.V.*, 85 A.3d 725, 799 (Del. Ch. 2014). Likewise, "when a corporation empowers managers with the discretion to handle certain matters and to deal with third parties, the corporation is charged with the knowledge of those managers when the corporation is sued by innocent parties." *In re Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 887 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of Louisiana v. Gen. Re Corp.*, 11 A.3d 228 (Del. 2010).

As opposed to a claim under Rule 10b–5(b), which relates to deceptive statements, Rule 10b–5(a) and (c) claims make deceptive conduct actionable. *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 643 (3d Cir. 2011). Section (a) of Rule 10b-5 makes it unlawful "[t]o employ any device, scheme, or artifice to defraud . . . ." 17 C.F.R. § 240.10b-5(a). Section (c) imposes liability for defendants' acts, practices, or course of business "which operate[] or would operate as a fraud or deceit" on plaintiffs. 17 C.F.R. § 240.10b-5(c). Liability under the latter two sections is sometimes called "scheme" liability. *S.E.C. v. Lucent Technologies, Inc.*, 610 F. Supp. 2d 342, 358 (D.N.J. 2009).

The United States Supreme Court has precluded "scheme" liability claims against aiders and abettors. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 179 (1994). To state a claim for a primary liability, a plaintiff is required to allege the following elements: (1) the defendant's manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) the plaintiff's reliance. *See, e.g., Stichting Pensioenfonds ABP v. Merck & Co.*, 2012 WL 3235783, at *7 (D.N.J. Aug. 1, 2012). *See also In re Enron Corp. Sec., Derivative*

& "ERISA" Litig., 439 F. Supp. 2d 692, 717 (S.D. Tex. 2006) (same); In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004) (same).

The Third Circuit courts premise "scheme" liability on misconduct separate from misrepresentations and omissions violating Rule 10b-5(b). See, e.g., In re DVI, Inc. Sec. Litig., 919 F. Supp. 2d 498, 512 (E.D. Pa. 2013) (deciding whether the senior vice president could be liable for the company's schemes of understating its losses); Stichting Pensioenfonds ABP, 2012 WL 3235783, at *10 (dismissing a "scheme" liability claim because the plaintiff failed to allege the defendant participated "in artifices or devices to defraud . . . distinct from the charged campaign of misinformation and suppression of data regarding the safety profile of [the company], on which [the plaintiff] relied in making a purchase or sale of . . . stock"); Lucent, 610 F.Supp.2d at 359 (noting that a scheme liability claim cannot be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b–5(b) claim).

Here, allegations of Davis and Salazar's misrepresentations and omissions are sufficient to plead federal securities fraud by misrepresentation or omission under Section 10(b) and Rule 10b-5(b). As members of Thermo's leadership team, Davis and Salazar made representations and warranties that later became part of the Contract. (D.I. 14 at 35.) The leadership team represented, inter alia, that the Business had not suffered a material adverse effect before the closing date (D.I. 19, Ex. 1 at § 2.1), and that "all . . . mechanical and other systems located [at the Reynosa facility were] in good operating condition . . . ," and "no condition exist[ed] requiring material repairs, alterations or corrections . . . ." (Id. at § 2.11.) When the leadership team made these

16

representations and warranties, Thermo was allegedly considering installation of additional guard booths and other security system "alterations" to protect the Reynosa facility from activities by the Gulf drug cartel. (D.I. 14 at 26.) Since the cost of alterations to the Reynosa facility's security system purportedly amounted to $218,425, a reasonable securities buyer in OpenGate's position could find the disclosure of the cartel presence at the Reynosa facility materially changed the total mix of information available.

Davis and Salazar made statements to OpenGate under circumstances raising a strong inference of scienter. According to OpenGate, Enriquez informed Salazar about the cartel presence at the Reynosa facility on November 11, 2011. (Id. at 22-23, 25.) Davis purportedly knew about the cartel activities "long before" the Contract's execution. (Id. at 31.) The leadership team, however, did not share information about the cartel with OpenGate (id.), and Thermo tellingly removed the hard drive from Mr. Davis' computer. (Id. at 21.)

OpenGate plausibly pleads reliance when it states the leadership team "made a variety of statements, which separately, and taken together formed the basis for OpenGate's decision to purchase" the Business. (Id. at 9.) As OpenGate explains, had it not intended to rely on the statements of Thermo's leadership team, those statements would not have become part of the Contract. (Id.; D.I. 19, Ex. 1 at §§ 2.1-2.25.)

Apparent authority in Davis and Salazar may exist in light of Thermo's representation to OpenGate they were "responsible for[] the provision of diligence and other materials throughout the negotiations . . . [and had] the requisite knowledge to

17

provide the foundation for [the various] misrepresentations and warranties on Thermo[]'s behalf concerning the [B]usiness." (*Id.* at 31.) Likewise, because Davis and Salazar were Hamilton Entities' executives, their knowledge of the cartel activities in Reynosa may be imputed to Thermo and Hamilton Entities. Therefore, OpenGate has pled securities fraud by misrepresentations or omissions with sufficient particularity.

OpenGate fails to assert, however, that Thermo's misconduct rose to the level of "scheme" liability under Rule 10b-5(a) and (c) separate from liability under Rule 10b-5(b). On the contrary, as may be inferred from the first amended complaint, Thermo's alleged schemes and "manipulative practices" were directed to induce OpenGate's reliance on representations and omissions of Thermo's leadership team and create an illusion that these representations and omissions reflect the true state of both the Business and the Reynosa facility. (*Id.* at 28-33.)

Also, OpenGate offers only conclusory statements in support of its allegations that the rushed sale of the Business and the attendant violations of Rule 10b-5(b) concealed the falsity of Thermo's prior public statements. OpenGate speculates Thermo's failure to sell the Business in 2012 "would have raised concern about undisclosed liabilities by public investors, and would have directly impacted [Thermo]'s earnings per share, arguably the most important metric on Wall Street." (*Id.* at 7-8.) OpenGate, however, does not allege Thermo's Form 8-K listing the Business revenues for 2011 as $180 million is false or state what the true value of the Business is in its estimation. (*Id.* at 7.) In sum, OpenGate fails to allege Thermo's liability under Rule 10b-5(a) and (c).

Accordingly, the court denies Thermo's motion to dismiss OpenGate's Rule 10b-

5(b) claim, but grants the motion to dismiss OpenGate' Rule 10b-5(a) and (c) claims

with prejudice.

### 2.    Section 9(a)(4) of the SEA

Thermo moves to dismiss OpenGate's Claim VI for failure to plead a false

statement, scienter, and reliance.  (D.I. 17 at 21 fn. 11.)

> Section 9(a)(4) makes it
>
> unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange . . . to make, regarding any security registered on a national securities exchange, any security not so registered, any security-based swap, or any security-based swap agreement with respect to such security, for the purpose of inducing the purchase or sale of such security, such security-based swap, or such security-based swap agreement any statement which was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, and which that person knew or had reasonable ground to believe was so false or misleading.

15 U.S.C. § 78i(a)(4).

Subsection (f) of the same statute limits private causes of action based on

violations of Section 9(a) to willful misrepresentations:

> [a]ny person who willfully participates in any act or transaction in violation of subsection[] (a) . . . of this section, shall be liable to any person who shall purchase or sell any security at a price which was affected by such act or transaction, and the person so injured may sue in law or in equity in any court of competent jurisdiction to recover the damages sustained as a result of any such act or transaction.

15 U.S.C. § 78i(f).

There has been little judicial interpretation of pleading requirements of Section 9

of the SEA.  In its discussion of congressional intent behind Sections 10(b) and 9(a) of

the SEA, the United States Supreme Court has generally stated actionable securities

fraud requires more than negligence. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976).

The court finds persuasive guidance from district courts in this Circuit and other Circuit courts, which require plaintiffs to plead the following elements: (1) the defendant's material misrepresentation; (2) scienter; (3) intent to induce reliance; (4) the plaintiff's reliance; and the (5) plaintiff's act in detrimental reliance. *See Carson v. Bazilian*, 1990 WL 158648, at *3 (E.D. Pa. Oct. 15, 1990) (under the totality of circumstances, the plaintiff adequately pled violations of Section 9(a) of the SEA when he alleged the defendant's false statements of material facts made without regard for their truth or falsity, the defendant's intent to induce reliance, and the plaintiff's act in reliance on these statements); *Vosbikian v. Wasserstrom*, 1986 WL 824, at *1 (E.D. Pa. Jan. 13, 1986) (noting that allegations of fraudulent concealment may show a violation of Section 9(a) of the SEA); *Stark Trading & Shepherd Inv. Int'l v. Falconbridge Ltd.*, 2008 WL 153542, at *16 (E.D. Wis. Jan. 14, 2008), *aff'd sub nom. Stark Trading v. Falconbridge Ltd.*, 552 F.3d 568 (7th Cir. 2009) (dismissing Section 9(a)(4) claim for failure to allege scienter and reliance); *Chemetron Corp. v. Business Funds, Inc.*, 682 F.2d 1149, 1162 (5th Cir.), *vacated on other grounds*, 460 U.S. 1007 (1982) (stating in dictum liability attaches to misleading statements made knowingly but not recklessly). *But see Panfil v. ACC Corp.*, 768 F. Supp. 54, 59 (W.D.N.Y. 1991), *aff'd*, 952 F.2d 394 (2d Cir. 1991) (Rule 10b-5 creates a lower burden than Section 9(a)(4) of the SEA). Under the plain reading of Section 9(a)(4), a proper pleading must also allege the

defendant's use of mail, some means of interstate commerce, or a national securities exchange.

Here, OpenGate adequately pled the violation of Section 9(a)(4) as a result of its averments of violations of Section 10(b) of the SEA and Rule 10b-5(b) and its allegations that the closing "took place via interstate electronic communications with OpenGate in California and Thermo . . . in Massachusetts." (D.I. 23 at 7.) Accordingly, the court denies Thermo's motion to dismiss as to OpenGate's Claim VI.

## B.  Common Law Claims

OpenGate's first amended complaint includes three common law tort claims: fraud through misrepresentations and omissions, fraud by concealment, and negligent misrepresentation. (D.I. 14 at 33-44.) OpenGate also asserts a contractual claim for the breach of the implied covenant of good faith and fair dealing. (*Id.* at 47.)

### 1.  Delaware law governs common law claims.

Following transfers, the Third Circuit courts use the transferee forum' substantive law, including the choice of law rules. *See Lafferty v. St. Riel*, 495 F.3d 72, 81 (3d Cir. 2007). When parties contractually agree on a choice of law, Delaware courts use the RESTATEMENT (SECOND) OF CONFLICT OF LAWS to determine whether the parties' chosen law applies to the asserted claims. *See SIGA Technologies, Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 341-42 (Del. 2013). Delaware courts apply the parties' chosen law to contractual claims unless the state of the chosen law bears no "substantial relationship" to the parties or the transaction or application of the law of the chosen state is contrary to a fundamental policy of a state with a materially greater interest than the state of the

chosen law, when the law of the state with a materially greater interest would apply but for the choice of law clause in the parties' contract. *Id.* at 342 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (1971)). Delaware courts apply the parties' contractually chosen law to tort claims so long as the state of the chosen law bears "the most significant relationship to the [events at issue] and the parties." *State Farm Mut. Auto. Ins. Co. v. Patterson*, 7 A.3d 454, 457 (Del. 2010) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(1) (1971)).

A business entity organized under Delaware laws bears a substantial, significant, and material relationship to the state of Delaware. *Coface Collections N. Am. Inc. v. Newton*, 430 F. App'x 162, 167 (3d Cir. 2011). As a matter of public policy, Delaware has a "substantial interest in enforcing . . . voluntarily negotiated contract clause[s] . . . explicitly designat[ing] Delaware law to govern. That interest is not overcome by any other state's materially greater interest." *Id.* at 168. Delaware also has a substantial interest in ensuring its citizens' ability "to use [Delaware] law as a common language for their commercial relationships, particularly when those relationships involve interstate commerce and do not center in any material manner on the geography of any particular party's operational headquarters." *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1049-50 (Del. Ch. 2006).

Here, the court will apply Delaware law to OpenGate's tort and contract claims because the jurisdiction has both a substantial and the most significant relationship to the parties and the events at issue. Delaware is central to the case because the main parties are Delaware citizens; Thermo and Hamilton Entities are organized under

22

Delaware law. The first named plaintiff, OpenGate Capital Group LLC, and four of its subsidiaries named as plaintiffs are creatures of Delaware law as well. (D.I. 14 at 5-6; D.I. 19, Ex. 1 at 17.) Only one of OpenGate's subsidiaries included as a plaintiff is a California LLC. (D.I. 14 at 5-6.)

More important, these plaintiffs voluntarily agreed to adjudicate their disputes under Delaware law. OpenGate was a sophisticated negotiator represented by counsel when it contracted with Thermo and knew or should have known what rights and responsibilities attach to its voluntary choice of law. Allowing OpenGate to change the applicable law would amount to rewriting the Contract.

OpenGate's argument that California has a greater interest in adjudicating this matter than Delaware is not persuasive because no state has a greater interest than Delaware in adjudicating disputes of its citizens. The fact that OpenGate electronically signed the Contract at its headquarters in California and later brought this action in California does not make California central to the events at issue. Following OpenGate's logic, the court would be obliged to find Massachusetts had a greater interest in this matter than Delaware and California because Thermo prepared its allegedly misleading reports, hosted a meeting with OpenGate, and signed the Contract in Massachusetts. (*Id.* at 6; D.I. 23 at 7.)

OpenGate argues the choice of law clause does not apply to its tort claims because they relate to negotiations between the parties rather than the Contract itself. The court is not persuaded because adjudication of OpenGate's tort claims will require analysis of the Contract and related documents, particularly for any claim of fraudulent inducement. Likewise, interpretation of the non-reliance clause in the Contract and the

23

Confidentiality Agreement between the parties is necessary to adjudicate OpenGate's negligent misrepresentation claim. As the California court explained in its order transferring this matter to Delaware, even OpenGate's claims based on negotiations leading to the Contract "relate" to the Contract. (D.I. 30 at 4). *See also Abry Partners*, 891 A.2d at 1049 ("When parties have chosen a state's contract law to govern their contract, it is illogical to assume that they wished to have the enforceability of that contract judged by another state's law.").

OpenGate erroneously argues the Ninth Circuit courts disregard the parties' chosen law and apply the forum state's tort law to tort claims. (D.I. 24 at 19.) As the cases OpenGate cites in support of this proposition show, similar to the Third Circuit, the Ninth Circuit applies the forum state's *choice of law* rules to ascertain which tort law to apply. *See Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) (applying Arizona law to the plaintiff's tort claims despite the contractual agreement to use California law because Arizona had "the most significant relationship" to the parties and events). An approach favoring the forum state's tort law would also contradict the general public policy against forum shopping. Accordingly, the court will apply Delaware law to OpenGate's tort and contract claims.

### 2. Fraudulent Misrepresentation

Thermo argues OpenGate's claim for fraudulent misrepresentation must be dismissed for failure to allege misrepresentations, scienter, and reliance with sufficient particularity. (D.I. 17 at 22.)

Common law fraud may occur through overt misrepresentations, silence or omissions in the face of a duty to speak, and active concealment of material facts. *See*

*Transdigm Inc. v. Alcoa Global Fasteners, Inc.*, 2013 WL 2326881, at \*6 (Del. Ch. May 29, 2013). Actionable misrepresentation may take the form of false statements or be conveyed in a technically true statement, or a "half-truth." *See Norton v. Poplos*, 443 A.2d 1, 4-5 (Del. 1982). A plaintiff may bring a cause of action based on fraudulent or negligent misrepresentation based on a half-truth if the half-truth "causes a false impression as to the true state of affairs, and the [defendant] fails to provide qualifying information to cure the mistaken belief." *Id.* at 5.

To allege common law fraud by misrepresentation or omission, Delaware courts require a plaintiff to plead (1) the defendant falsely represented or omitted facts the defendant had a duty to disclose; (2) the defendant knew or believed the representation was false or made the representation with reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (5) the plaintiff acted in justifiable reliance on the representation; and (6) the plaintiff was injured by his reliance. *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005). Delaware courts require the circumstances constituting fraud to be stated with particularity, but intent and knowledge may be averred generally. *Transdigm*, 2013 WL 2326881, at \*6.

Delaware courts allow claims for fraudulent inducement of a contract in addition to claims alleging common law fraud. *See Anvil Holding Corp. v. Iron Acquisition Co.*, 2013 WL 2249655, at \*4 (Del. Ch. May 17, 2013) (denying the defendant's motion to dismiss the plaintiff's claims for fraud and fraudulent inducement). To plead fraudulent inducement, the plaintiff must allege the same elements as for a claim of fraud by

25

misrepresentation or omission. *See E.I. DuPont de Nemours & Co. v. Florida Evergreen Foliage*, 744 A.2d 457, 462 (Del. 1999) (requiring the plaintiff to allege the defendant's false representation of a material fact, scienter, intent to induce reliance, the plaintiff's act or inaction in justifiable reliance, and the plaintiff's damages resulting from such reliance). *See also RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 118-19 (Del. 2012) (the plaintiff alleged material misrepresentations but ultimately failed to show reliance under both Delaware and New York law); *Norton v. Poplos*, 443 A.2d at 4-6 (requiring material misrepresentation). The most common remedy for fraudulent inducement of a contract is rescission, but Delaware courts have also awarded restitution and damages. *See U.S. West, Inc. v. Time Warner Inc.*, 1996 WL 307445, at *25 (Del. Ch. June 6, 1996).

Here, OpenGate's allegations may adequately support a claim for fraud by misrepresentation or omission. The facts OpenGate recites in support of its claims for federal securities fraud satisfy the elements of common law fraud by misrepresentation or omission, except Thermo's duty to disclose material facts. At this stage of the proceedings, Thermo's duty to disclose material facts may be inferred from Article II of the Contract containing Thermo's representations and warranties. (D.I. 19, Ex. 1 at §§ 2.1-2.25.) OpenGate also alleges a number of half-truths that may have created a false impression about the true state of the Business. As OpenGate states, Thermo alerted OpenGate to "certain problems it faced," including "potential areas of improvements[] relating to its operations" but "[n]owhere in this mix did Thermo . . .

attempt to alert [OpenGate] to the real problems that existed in connection with the operation of the [B]usiness and which threatened . . . [it]." (D.I. 14 at 12.)

However, OpenGate's allegations are ambiguous because they may also support a claim for fraudulent inducement of the Contract. Although OpenGate does not assert a separate claim for fraudulent inducement, such a claim may be inferred from allegations in support of its Claims I, II, and III. Throughout the first amended complaint, OpenGate repeats "the entire [Contract] was misleading and itself false, and induced by [Thermo]'s fraudulent concealment of material information designed to induce [OpenGate]'s purchase of the [Business] despite serious concerns that should have been disclosed." (*Id.* at 32, 37, 42.) OpenGate also states it "would not have purchased" the Business if Thermo had disclosed certain material facts. (*Id.* at 38.) Since OpenGate does not request rescission, its prayer for relief is not instructive. (*Id.* at 47-48.) Lastly, OpenGate's opposition to Thermo's motion to dismiss the first amended complaint fails to clarify whether OpenGate asserts a claim for fraudulent inducement of the Contract in addition to its fraudulent misrepresentation claim. (D.I. 24 at 20-22.)

Due to this ambiguity in OpenGate's Claim II, the first amended complaint fails to place Thermo on notice of the precise misconduct with which it is charged. Accordingly, the court dismisses OpenGate's Claim II with leave to amend.

### 3. Fraud by Concealment

OpenGate alleges Thermo took affirmative actions to prevent it from discovering the cartel activities at the Reynosa facility during due diligence. Thermo argues

27

OpenGate's claim for fraud by concealment should be dismissed because OpenGate fails to allege it inquired about the cartel activities.

To allege fraudulent concealment, a plaintiff must plead with particularity the defendant's affirmative action which was intended to prevent and indeed prevented the discovery of material facts giving rise to the fraud claim; some artifice to prevent knowledge of these facts; or some representation intended to exclude suspicion and prevent inquiry. *Transdigm*, 2013 WL 2326881, at *6. A claim of fraud based on active concealment does not require pleading a pre-existing duty to speak. *Id.* "Not volunteering when not asked is not active concealment." *Airborne Health, Inc. v. Squid Soap, LP*, 2010 WL 2836391, at *9 (Del. Ch. July 20, 2010).

Here, OpenGate pleads active concealment with sufficient particularity. In support of its claim, OpenGate alleges Webb ordered numerous employees not to disclose the cartel activities to the OpenGate's representatives. (D.I. 14 at 18.) On or shortly after September 23, 2012, Wood allegedly lied to Enriquez the due diligence period was over and advised him not to disclose the cartel activities. (*Id.* at 18-19, 29-30.) According to OpenGate, Thermo knew when the cartel members were most likely to be present at the Reynosa facility and limited OpenGate's access to the Reynosa facility during those times. (*Id.* at 23.) At this stage of the proceedings, active concealment may also be inferred from OpenGate's statement that Thermo "dump[ed] . . . thousands of pages of documents in the data room . . . ." (*Id.* at 19.)

The court is not persuaded that OpenGate failed to allege it inquired about the cartel activities during due diligence. OpenGate alleges it inquired of Thermo's

28

leadership team about the physical condition of the Reynosa facility, the functionality of its security system, conditions materially and adversely affecting the Business, and capital expenditures necessary to run the Business. (*Id.* at 20, 39-42.) OpenGate representatives also asked to inspect the Reynosa facility's premises during due diligence. (*Id.* at 23.) Lastly, OpenGate alleges it directly asked Thermo about the criminal activities in the city of Reynosa and was told "it was not a worry." (*Id.* at 12.) In light of OpenGate's averment that it had no independent knowledge of the cartel activities until it took possession of the Reynosa facility following the sale of the Business (*id.* at 42), the court is satisfied that OpenGate pled active concealment with sufficient particularity. Accordingly, the court denies Thermo's motion to dismiss as to OpenGate's Claim III.

### 4.    Negligent Misrepresentation

OpenGate contends Thermo negligently misrepresented the true state of the Business through affirmative misrepresentations and half-truths. (D.I. 14 at 44; D.I. 24 at 23-24.) Thermo counters that OpenGate's negligent misrepresentation claim must fail for the same reasons as OpenGate's claims for federal securities and common law fraud. (D.I. 17 at 25.) Thermo further argues that OpenGate failed to allege misleading half-truths. (D.I. 26 at 23-24.)

To allege negligent misrepresentation under Delaware law, a plaintiff must assert the same elements as for a fraud claim, except the defendant's knowledge or reckless indifference of the truth is not required. *Oracle Partners, L.P. v. Biolase, Inc.*, 2014 WL 2120348, at *18-19 (Del. Ch. May 21, 2014). Under Delaware law, negligence must be

pled with particularity. *White v. APP Pharm., LLC*, 2011 WL 2176151, at *2 (Del. Super. Apr. 7, 2011).

Here, under a lower pleading standard, OpenGate's allegations in support of its claims for federal securities and common law fraud are sufficient to allege negligent misrepresentation. The court has previously addressed misrepresentations by half-truths. Accordingly, the court denies Thermo's motion to dismiss as to OpenGate's Claim IV.

### 5.    Breach of the Implied Covenant of Good Faith and Fair Dealing

The implied covenant of good faith and fair dealing attaches to every contract. *Gloucester Holding Corp. v. U.S. Tape & Sticky Products, LLC*, 832 A.2d 116, 128 (Del. Ch. 2003). Delaware courts use the implied covenant of good faith and fair dealing to infer contractual terms where the party asserting the implied covenant shows the other party acted so arbitrarily and unreasonably as to "frustrate[] the fruits of the bargain that the asserting party reasonably expected." *Nemec v. Shrader*, 991 A.2d 1120, 1125-26 (Del. 2010). Courts assess the parties' reasonable and legitimate expectations as of the time of contracting but will not rewrite contracts "to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal." *Id.*

In the instant matter, OpenGate adequately pleads a claim for breach of the implied covenant of good faith and fair dealing. As OpenGate explains, misrepresentations, half-truths, and omissions by Thermo's leadership team created an impression the Reynosa facility was a picture of "health and stability." (D.I. 24 at 4.) Based on these misrepresentations and omissions, OpenGate reasonably expected to

30

purchase a lucrative business. (*Id.*) Instead, the contract between the parties

"ultimately [resulted in] stepp[ing] into the shoes of a business fraught with daily

problems which render the investment unsellable." (D.I. 17 at 5.) OpenGate also

alleges Thermo failed to meet its contractual obligations to pay Mexican taxes, which

exposed OpenGate to a \$2.6 million tax liability. (*Id.* at 5, 28.) Thus, OpenGate has

adequately pled its loss of the benefit of its bargain with Thermo. Accordingly, the court

denies Thermo's motion to dismiss as to OpenGate's Claim VII.

## C.    Violation of the CAL. CORPS. CODE

OpenGate's Claim V avers violation of Section 25400, *et seq.* of the CAL. CORPS.

CODE. (D.I. 14 at 44-45.) OpenGate's opposition to Thermo's motion to dismiss the

first amended complaint focuses on Section 25401 of the same code. (D.I. 24 at 16-

18.)

The court dismisses OpenGate's Claim V with prejudice because OpenGate

waived its right to sue Thermo under California law when it agreed to adjudicate

disputes with Thermo under Delaware law.[5] Even if Thermo's violations were beyond

the scope of the Contract's choice of law clause, the court would dismiss this claim for

failure to allege the necessary element.

Under Section 25400, it is unlawful for any person

in this state . . . [i]f such person is a broker-dealer or other person selling or
offering for sale or purchasing or offering to purchase the security, to make,
for the purpose of inducing the purchase or sale of such security by others,
any statement which was, at the time and in the light of the circumstances
under which it was made, false or misleading with respect to any material
fact, or which omitted to state any material fact necessary in order to make

_____

[5] *See supra* Part IV.B.1.

31

the statements made, in the light of the circumstances under which they
were made, not misleading, and which he knew or had reasonable ground
to believe was so false or misleading.

CAL. CORPS. CODE § 25400 (West, 2014).  Other sections of this Code pertaining to
securities fraud do not contain the qualifier "in this state."  *See, e.g.*, CAL. CORPS. CODE
§§ 25401-25403 (West, 2014).

Here, OpenGate fails to allege Thermo and Hamilton Entities made false or
misleading statements while in California.  OpenGate states Thermo and OpenGate
negotiated across state lines.  The closing also "took place via interstate electronic
communications with OpenGate in California and Thermo . . . in Massachusetts."  (D.I.
23 at 7.)  OpenGate claims Thermo "physically delivered" unidentified securities
certificates to OpenGate in California  (D.I. 14 at 45), but absent an allegation that
Thermo or Hamilton Entities' representatives made false or misleading statements to
OpenGate while in California, averring "physical[] deliver[y]" of securities certificates to
California is not sufficient to establish a claim under Section 25400.  Accordingly, the
court grants Thermo's motion to dismiss as to OpenGate's Claim V with prejudice.

## V.    CONCLUSION

For the foregoing reasons, the court (1) denies Thermo's motion to dismiss as to
OpenGate's Claim I insofar it alleges violation of Rule 10b-5(b); (2) denies Thermo's
motion to dismiss as to OpenGate's Claims III, IV, VI, and VII; (3) grants Thermo's
motion to dismiss as to OpenGate's Claim I insofar it alleges violation of Rule 10b-5(a)
and (c) with prejudice; (4) grants Thermo's motion to dismiss as to OpenGate's Claim II
with leave to amend within 30 days following this decision; (5) grants Thermo's motion
to dismiss as to OpenGate's Claim V with prejudice.

Dated: July 8, 2014

UNITED STATES DISTRICT JUDGE

33